RESERVE LIFE INSURANCE COMPANY, Plaintiff-in-Error, v. ETHEL WHITTEMORE and HELEN HOLLAND, Administratrix of the Estate of VICKIE K. CARUTHERS, Deceased, Defendants-in-Error. —442 S.W.2d 266

Middle Section. February 28, 1969.

Certiorari Denied by Supreme Court June 2, 1969.

James L. Roberts, of Farris, Evans & Evans, Nashville, for plaintiff in error.

Richard J. Brodhead, Lebanon, for defendants in error.

TODD, J. This is an appeal in error by defendant, Reserve Life Insurance Company, from a jury verdict and judgment in favor of the plaintiff, Ethel Whittemore, for accidental death benefits under an insurance policy on the life of Mrs. Vickie K. Caruthers, deceased mother of plaintiff. Helen Holland, administratrix of the estate of the deceased was removed from the case by dismissal and is not a party to this appeal.

The assignments of error are as follows:

*"Assignment Number 1*

The Court erred in failing and refusing to grant in its entirety defendant's motion for a directed verdict at the conclusion of all the evidence in that there was no evidence to establish that the insured's death was the result of accidental bodily injury directly and independently of all other cause and, therefore, such death was not within the coverage of the policy.

*"Assignment Number 2*

The Court erred in failing and refusing to grant defendant's motion for a directed verdict at the conclusion of all the evidence when such evidence established without contradiction that a number of causes other than accidental bodily injury, including a urinary tract infection and arteriosclerosis, were causes contributing to the death of the insured and, therefore, such death was not within the coverage of the policy."

Pertinent provisions of the insurance policy in question are as follows:

*"accidental bodily injury due to violent and external means,* and within ninety (90) days from the date of the accident such accidental bodily injury shall, *directly and independently of all other cause,* result in any of the following specific total losses, * * *

\* \* \* \* \* \*

"For Loss of Life * * * Five Thousand Dollars"

There is no conflict in the testimony. The daughter and granddaughter of deceased testified, but offered no information relating to the cause of death.

Defendant offered the death certificate of deceased showing:

"19 Cause of Death

Part 1. Death was caused by:

Immediate cause: (A) CVA 331

Interval between onset and death: 2 days

Due to: (B) arteriosclerosis 450

Interval between onset and death: years."

The only other evidence was the deposition of Dr. Jack L. Clark, who signed the death certificate. There is no indication of any objection to the admissibility of any part of the deposition.

Pertinent parts of the deposition are as follows:

"Q And when did you first see her?

A I saw her on a house call February 17, 1967.

Q And what were you called for?

A They called me stating that *she had fallen out of bed about five times during the night* and said she wasn't able to come to the Clinic and wanted me to come to see her.

Q When you went what did you find—what was the condition that you found her in?

A *She was a very obese lady* and she was laying in a real loose, soft, feather bed that just about halfway covered her and *she was in some pain,* but in the home it was just almost impossible to examine this

lady so I talked them into getting an ambulance and bringing her to the hospital where I examined her again after she got to the hospital.

Q Alright, after you examined her in the hospital what did you find?

A As far as present illness, and-so-forth, she seemed to be *a little bit mentally disturbed.* This *could have been from some fever that she had,* having chills, with fever and that *she had had such severe chills during the night that she had fallen out of bed,* according to the family, and according to the patient, about five times, and when we got her in the hospital she was complaining of *quite a bit of pain in her back.* As far as review of system, she had had numerous complaints in the past, most of it relative to a hip injury that she had had several years ago and had subsequent surgery and pinning of this right hip and it had continued to give her quite a bit of trouble.

Q Now, when you examined her did you find any *marks, bruises, contusions* or anything on her body of any * * *

A *No, there were none.* The only tenderness she had was over the right hip where she had had her previous surgery, but there were no bruises or anything here.

Q After you got her to the hospital how long did she stay in the hospital?

A She was admitted that day and she died *February 26th.* She stayed in the hospital this entire time. She was not discharged.

Q Now, what would you say her *cause of death* was?

A She had a *urinary tract infection with septicemia* and she had a *cerebral vascular accident* with increased intracranial pressure. This cerebral vascular accident, by the way, developed during her hospitalization and the *death was from the CVA,* or stroke.

Q Now, would you say the fall that she had was the cause of her death?

A *I say that it could have contributed—it could have caused the stroke* and I'm saying by this stroke that *she probably ruptured a blood vessel in her brain that slowly leaked*—that bled slowly and so that this CVA that became apparent over a period of time, rather than right at first, in other words, you can get a slow leak of blood vessel and gradually builds up pressure in your brain and then these symptoms become apparent after a few days. Some of them even develop, say, after two weeks after an injury to your head, *so that I say that it's conceivable that the fall did this.*

Q You're saying the fall * * *

A The reason *I'm not saying that it did* is because I did not obtain an autopsy and I don't know for sure what happened.

Q Well, are you saying the fall caused the leakage?

A *I'm saying that the fall could have caused it.*

Q The leakage that brought the stroke on?

A Right. Well, the leakage and the stroke is actually the same thing. A stroke—a cerebral vascular acci-

dent is either one of two things, either you have a blood vessel that leaks blood out into the brain tissue, or you have a clot, either one, so a stroke can be either one of those two, and I'm saying that she had the leakage of a blood vessel rather than a blood clot on her brain.

Q Were you her attending physician prior to this accident?

A Yes, I had seen her prior to this.

Q Well, did she have any symptoms of this leakage prior to this fall?

A No, the last time I had seen her prior to this was in July of 1966, which I saw her—well, twice that month for arthritis in her hip and her spine.

Q Did she have any case history of high blood pressure, or anything, to bring on this stroke other than the leakage?

A She had had high blood pressure in the past. In June of '66 I have one notation here of blood pressure being 180/70. However, during her hospitalization and till the time she died her blood pressure was never elevated any during this hospitalization. In fact, it was a little bit low.

\* \* \* \* \* \*

Q And you said, in answer to Mr. Brodhead's question, that you found that she had this urinary tract infection with septicemia. Now, what is septicemia?

A It's when the infection gets in the blood stream.

Q It's really what we laymen call blood poisoning, is that correct?

A Could be, yes.

Q *Could this infection have caused her to become delirious during the night?*

A *Yes, sir.*

Q Was it your conclusion that that was what had caused her to fall out of bed these four or five times during the night?

A *Fever and the chills that she claimed to have I thought probably was what caused her to fall.*

Q *And that the fever and chills were due to this infection?*

A *Right.* Now, this septicemia was diagnosed on the basis of temperature being up to 104 immediately following admission, and staying up until * * * on the 20th it was down to 100 and she was afebrile on the 22nd.

&ast; &ast; &ast; &ast; &ast; &ast;

A *The immediate cause of death was Cerebral Vascular Accident as a result to atherio-sclerosis,* or hardening of the arteries. In other words, this is something that all old people have, is hardening of the arteries.

&ast; &ast; &ast; &ast; &ast; &ast;

A *Uninary tract infection is contributed to the death.*

&ast; &ast; &ast; &ast; &ast; &ast;

Q Doctor, in view of the statements which you've previously signed, and which you've just identified here, and in view of your testimony here this

morning, I take it that what you are saying is, that there is a possibility that *the fall could have caused the stroke,* but that really was not your conclusion at the time of death, is that correct?

A *My conclusion at the time of death is that it could have caused it.* Now, here again I go back to the fact that no autopsy was obtained and *I don't know the exact cause of death,* but this patient was an elderly patient with arterio-sclerotic disease, radical sclerosis, hardening of the arteries, who had fallen, and *it's conceivable that this fall did cause this blood vessel to break* and start leaking that later showed up during her hospitalization, and *ultimately caused the death.* Now, to further clarify that just a little bit, I think that if I had fallen out of bed I probably would not have suffered a stroke later, but *the fact that she also had the hardening of the arteries I think makes it more likely that this could have occurred.* In other words, her vessels are more brittle and a sudden fall, or sudden trauma to the head, makes these vessels more likely to rupture and bleed.

\* \* \* \* \* \*

Q And if I understand you, *the fall in turn, in your opinion, was caused by the fact that she had become delirious from the urinary tract infection* and the \* \* \*

A *Septicemia.*

Q *Blood poisoning?*

A *Right.*

\* \* \* \* \* \*

Q If you were to explain the cause of a person's death from that statement, Attending Physician's Statement, and the portion that you've just read, what would you say caused the person's death?

A Well, *I'd say that the chills and fever caused her to fall out of bed, which in turn caused her to have a cerebral vascular accident.*

* * * * * *

Q In your professional opinion, Doctor, would this patient have died from the hardening of the arteries or this urinary tract infection if she had not fallen from the bed—in other words, what I'm saying is, was her infection and her hardening of the arteries so serious at the time that you were treating her that she would have expired without falling?

A Well, to answer that question without giving you a direct yes or no, I might point out to you that in her record her fever had come down to normal on antibiodic treatments so, apparently, we had gotten her bladder infection and her blood poisoning, or septicemia, under control or at least this would be the indication—it's not always true when the fever and blood count comes down that you have it under control, but this is the indication. So from this, I thought at least that as far as her infection was concerned, I was making good head-way and we had this under control and then it became apparent that she was not doing well at all from some sort of *increased intracranial pressure, which I assume was due to the fall,* but *I don't know whether I can say that she would have recovered had she not fallen, or not.* This is something * * *

Q But, as you said, you were making head-way with everything other than this intracranial pressure, or pressure inside the head, is that right?

A Right, yet.

Q And this is eventually what caused the death, wasn't it?

A Yes. I think so. CVA eventually caused the death.

Q And this was caused from the pressure in the head?

A Right.

\* \* \* \* \* \*

Q *And you say that you feel that as a contributing factor that the fall caused the leakage which caused the pressure, is that right?*

A *The fall could have caused this.*

\* \* \* \* \* \*

Q Doctor, would she have had this leakage with just hardening of the arteries?

A You can spontaneously develop leakage from vessels as a result of hardening of the arteries. Now, whether she would have or not I don't know.

Q Was there any prior indication that she may?

A No, there was no prior indication that she had any difficulty from this—that it was causing her any difficulty?''

(Emphasis supplied)

It is the insistence of the defendant that the uncontroverted testimony of Dr. Clark is to the effect that the cause of death was cerebral vascular accident (leakage

of a blood vessel in the head) caused by arteriosclerosis (hard, brittle blood vessels) and/or a fall or falls which was/were caused by chills and fever caused by septicemia (blood poisoning) caused by cystitis (urinary tract infection).

Defendant further insists that even though a fall or falls was/were one of the causes of death, there were other contributing causes, to wit, arteriosclerosis, septicemia and cystitis which exclude the claim from coverage under provisions of the policy which insures for death by accidental means "independently of other causes."

Defendant further insists that the death certificate, quoted above, is prima facie evidence of its contents, especially cause of death, under Sec. 53-413 T.C.A., and that the speculative testimony of Dr. Clark otherwise is not sufficient to overcome the prima facie force of the death certificate signed by him to the effect that cause of death was C.V.A. due to arteriosclerosis.

In reply, plaintiff insists that the reasonable view of all of the evidence is that the immediate cause of death was cerebral vascular accident, caused by the fall or falls; that the arteriosclerosis was merely a condition of long standing which furnished the occasion for the fatal injury to do its lethal work.

█ In an action for benefits under a policy covering death resulting solely from accidental injury, the plaintiff has the burden of proving that the death of the insured resulted solely from accidental injury. Gilmore v. Continental Casualty Co., 188 Tenn. 588, 521 S.W.2d 814 (1949).

In the case of Wheelock v. Provident Life & Accident Co., 10 Tenn.App. 184 (1929), the insured died three days

after a fall which produced a bleeding at the lips and a cut or bruised forehead. One doctor stated that death was due to gastric and duodenal ulcers with gastric hemorrhages a contributing cause. The personal physician of the deceased stated that for a number of years deceased had suffered from a duodenal ulcer which was a very serious matter, which impaired the soundness of his health, and which produced recurrent bleeding which had so weakened him as to be the probable cause of his fall. Under such testimony, this Court held that a verdict for the plaintiff was not justified and affirmed a directed verdict for the defendant.

In the case of Provident Life & Accident Ins. Co. v. Campbell, 18 Tenn.App. 452, 79 S.W.2d 292 (1934), a verdict for plaintiff was set aside and the suit dismissed where the death of the insured resulted in part from mental disturbance arising from accidental injury of a child by deceased and partly from preexisting disease of blood vessels. The doctor's testimony was that death resulted from preexisting condition of blood vessels (sclerosis) coupled with pressure of undue excitement, and that the excitement would not have caused death without the preexisting sclerosis.

In the case of North American Ins. Co. v. Ellison, 37 Tenn.App. 546, 267 S.W.2d 115 (1954) the deceased was somewhat obese, 72 years of age, and suffered from a number of chronic organic diseases including impaired kidney function, hardening of the arteries (arteriosclerosis) enlarged heart and bronchitis. Two weeks after a fall and broken ankle, death resulted from massive pulmonary edema, or filling of the lungs with fluid, in turn caused by continued inactivity of bed rest. In

affirming a verdict and judgment for the plaintiff, this Court made the following comment:

"We think when properly analyzed and understood the net result of Dr. Jones' testimony is that being bedfast caused the clogging of the veins which in turn caused the formation of fluid in the lungs resulting in death; that while the chronic conditions and diseases with which insured was suffering did not cause death and were entirely compatible with life, the cumulative effect of the heart, lungs and kidneys being unable to function properly made it impossible for insured to survive confinement in bed.

"The proof shows that insured was leading an active life and doing her own house work prior to the accident. She would not have died when she did had it not been for the injury sustained in the fall because, except for that injury, she would not have been confined to bed and would not have suffered the consequences of stasis which in her case was fatal.

"The question is, Does a physical infirmity which lowers the resistance of an insured to the effects of injury and normal medical treatment, resulting in death, mean that death did not result directly from an accidental injury and independently of all other causes? Does an insurer take the insured with all the physical defects and infirmities existing at the date of the policy or which may develop with advancing age or is it bound to indemnify only against such results as would follow injury to one in normal health? We know that the chances of surviving an accident and medical treatment made necessary by an accident diminish progressively with age. But it could hardly

be argued that it is the function of the Court to say as a matter of law when old age and not the effects of an accident becomes the predominant cause of disability or death. Yet, the difficulty of drawing a line is little less formidable in cases like the present where a predisposing infirmity of body militates against the chances of recovery.

\*　\*　\*　\*　\*　\*

"[1] 'The insurance company \* \* \* may be held liable where the accident can be considered as the sole and proximate cause of death or disability, although disease or infirmity may have been present as a condition or secondary cause, or where the death is the reasonable and natural consequence of the injury, although disease may have supervened, or where the accident is the true cause of death or injury and the disease but the occasion.' 45 C.J.S. Insurance sec. 776, p. 812. See to the same effect 29 Am.Jur., p. 748.

"[2, 3] If the peril insured against be the efficient and predominating cause it is regarded as the proximate cause even though the result was brought about by a chain of events set in motion by the accident and 'operating with reasonable certainty to occasion the loss' and it is not necessary that the peril insured against be the nearest cause in point of time or place. Maness v. Life & Casualty Ins. Co., 161 Tenn. 41, 28 S.W.2d 339; Hughes v. Provident Mut. Life Ins. Co., Mo.App., 258 S.W.2d. 290.

"The opinion in the Maness case cites and relies upon authorities maintaining the view that, under an accident policy, recovery will be allowed 'although the more immediate cause of death be an operation neces-

sitated by the accidental injury.'' [161 Tenn. 41, 28 S.W.2d 340.]

''[4] Taking the evidence in the light most favorable to the plaintiff-beneficiary and giving him the benefit of every reasonable inference therefrom, we hold the evidence sufficient to support a jury finding that disease and age merely furnished a condition causing death to follow from a chain of events set in motion by the accident. One event in the chain was the bed rest to which insured was put as part of the treatment normal to a broken ankle * * *.'' 37 Tenn. App. 549, 550, 551, 552, 267 S.W.2d 116.

Distinguishing the case of Wheelock v. Provident Life, supra, the Ellison opinion continues:

''In that case the weakened condition of the insured due to disease caused him to totter on his feet and, as the court found, probably caused him to fall. If so, it could hardly be argued that disease was not a proximate cause of his death. Here, the reverse situation is presented. There is no insistence that any disease with which the insured suffered caused her to fall and, as we have pointed out, the injury sustained in the fall set in motion a chain of events resulting in death.'' 37 Tenn.App. 553, 267 S.W.2d 118.

Distinguishing the Campbell case, supra, the Ellison opinion states:

''In the Campbell case, supra, the insured suffered only a mental shock with no bodily injury when the automobile he was driving struck and injured a child. There was evidence that he suffered prior to the accident from hardening of the arteries which, coupled

with the unusual pressure caused by the excitement of the accident, resulted in death. A verdict was directed on two grounds: (1) The evidence showed that accident and disease concurred to cause death and, therefore, the accident could not have been the sole cause and (2) Excitement due to an accident cannot be considered a 'bodily' injury within the meaning of the policy." 37 Tenn.App. 553, 267 S.W.2d 118.

The two contrary Tennessee decisions are thus distinguished on the grounds of (1) preexisting condition as a cause of the fall, (2) affirmative evidence of concurrence of accident and preexisting disease as causes of death, and (3) peculiar provision of the policy requiring bodily injury.

In the case of Britton v. Prudential Ins. Co. of America, 205 Tenn. 726, 330 S.W.2nd 326, 82 A.L.R.2d 605 (1959), the deceased was a 70 year old man who was suffering from arteriosclerosis which was usual for a man of his age. Otherwise, his health was normal and he engaged in normal activity for one of his age. In a fall on an icy pavement, deceased suffered a severely broken hip for which he underwent surgery. 14 days after the fall, and while recuperating from the surgery, death came suddenly as a result of "acute coronary thrombosis". The doctor testified that the fall was a contributing cause of death, but was not directly related to the heart attack which produced death. The doctor further testified that deceased was suffering from a disease, or process of aging, which caused or proximately contributed to his death; and that but for the arteriosclerosis the heart attack would not have occurred. Another doctor testified unequivocally that death was not a result of accidental injury independent of all other

causes. The Supreme Court reversed a jury verdict and judgment for the plaintiff and dismissed.

In the Britton opinion the Supreme Court mentioned the Wheelock, Provident and Ellison opinions with the comment:

> "It being shown in the Ellison case that the facts of these two cases do not meet with the facts of the Ellison case." 205 Tenn. at 731, 330 S.W.2d 328.

Thus our Supreme Court has recognized that there may be cases of this sort in which the evidence does not justify a recovery and there may be cases of this sort in which the evidence may justify a verdict.

One of the criteria distinguishing between cases allowing a recovery and cases refusing a recovery is the nature of the medical testimony, especially in respect to the degree of probability expressed. Medical witnesses use terms such as "It is conceivable", "it might possibly have been", "it could have been", "it probably was", "it is my opinion that it was", or "it unquestionably was". Each such expression conveys its own degree of certainty or uncertainty and, uncontradicted, must be evaluated to determine whether it is sufficiently substantial to support a verdict.

In the case of Maryland Casualty Co. v. Young, 211 Tenn. 1, 362 S.W.2d 241, our Supreme Court said:

> "[1-3] The same rules of evidence apply to Workmen's Compensation cases as apply to other nonjury civil cases heard in the Circuit Court. Baxter v. Jordan, 158 Tenn. 471, 14 S.W.2nd 717. It is a well known rule of evidence a judgment cannot be based

on conjecture; speculation or surmise, and in the case of Nashville, C. & S. L. Ry. v. Reeves, 25 Tenn.App. 359, 157 S.W.2d 851, the Court quoted with approval the following from Corpus Juris Secondum and American Jurisprudence:

" 'Testimony of a physician as to the probable effect of the injury is admissible, but it should show that such result is reasonably certain and not a mere likelihood or possibility.' 25 C.J.S. Damages sec. 149, pp. 799, 800; 17 C.J. 1035, sec. 329.

" 'To warrant a recovery for a permanent injury, the future effect of the injury must be shown with reasonable certainty. It is not necessary that the evidence show conclusively or without a shadow of doubt that the injuries are permanent. But while absolute certainty should not be required, a mere conjecture, or even a probability, does not warrant the giving of damages for future disability which may never exist.' 15 Am.Jur. 486, sec. 75." 211 Tenn. 5, 6, 362 S.W.2d 243.

Testimony of experts as to the probable cause of injury should be subject to the same rules as applied supra in the case of probable effect of injury.

In the present case, the testimony of Dr. Clark that "it could have contributed", "I'm not saying that it did", "I'm saying that the fall could have caused it", "it's conceivable that this fall did * * * ultimately caused the death", "I assume was due to the fall", "the fall could have caused this", is not sufficient to show the reasonable likelihood that the fall was the cause of death

directly and independently of all other cause. The only other significant statement of Dr. Clarke is:

> "I'd say that the chills and fever caused her to fall out of bed, which in turn caused her to have a cerebral vascular accident."

Plaintiff insists that the last quoted statement should be accepted as unequivocal evidence in favor of the plaintiff (a) that the fall caused the C.V.A., especially if the statement is to be accepted as unequivocal in favor of the defendant (b) that the chills and fever caused the fall. This insistence cannot prevail for two reasons. (1) Statement (a) in favor of the plaintiff must be considered in the light of the repeated equivocation quoted above, whereas statement (b) is not weakened by any equivocation but is strengthened by testimony of delirium caused by infection. (2) Even if the statement (a) is accepted as unequivocal, it is not sufficient to sustain a verdict because it does not exclude "all other cause" as required by the policy. Statement (b) does not require the exclusion of "all other cause", because it relates to another cause which is a good defense.

Even if it be conceded that the evidence shows conclusively that the fall caused the death, if it also shows conclusively that the fall was caused by disease, then death was not due to accident "independent of all other cause".

Where the testimony leaves to speculation a determinative fact in a lawsuit, the party having the burden of proving the fact must suffer the loss. This raises the question of the burden of proof in suits upon accident insurance policies.

The general rule is stated in Gilmore v. Continental Casualty Co., supra. In cases involving the effect of preexisting bodily disease, the rule is well stated in Mulholland v. Fidelity & Casualty Co., 161 Pa.Super. 425, 55 A.2d 561 (1947).

"* * * The case was that type which calls for expert medical testimony to establish causal connection between an injury and death. Without such testimony, the jury was obliged to conjecture about the cause of the death; whether it resulted from the fall or the cerebral apoplexy; whether the cerebral apoplexy, which was admittedly the immediate cause of the death resulted from the fall or from the pre-existing arteriosclerosis condition. In short, appellant, upon whom rested the burden of proof, failed to present 'facts or circumstances from which the jury could infer legitimately *to the exclusion of other inferences equally plausible* that the insured's death resulted from an accident'. De Reeder v. Travelers Ins. Co., 329 Pa. 328, 333, 198 A. 45, 47. (Italics by Justice Maxey). Where the proof points to a pre-existing and substantial infirmity which equally with the alleged accident may have been the cause of the death the party upon whom rests the burden of proof must produce evidence to exclude the possibility that the infirmity was the cause of the death. Rodia v. Metropolitan Life Ins. Co., 354 Pa. 313, 47 A.2d 152."

■ Where, as in the present case, there is evidence of pre-existing disease which would naturally be expected to contribute to the fatal consequences of an accident, then the burden of the plaintiff includes the onus of introducing some evidence negating the likely concurrence of the disease in producing death. In the

present case, there is no such evidence. The plaintiff failed to carry the burden of offering some evidence excluding the causal connection of preexisting disease, and thereby failed to carry the burden of proving that death resulted from accident "independently of all other cause".

On the foregoing ground, the defendant was entitled to a directed verdict, but there is another and more cogent ground upon which a verdict should have been directed for the defendant.

■ The testimony of Dr. Clark, quoted supra, is to the effect that the fall or falls relied upon by plaintiffs were caused by delirium associated with infection, chills and fever. His testimony is uncontradicted and unimpeached. Neither the jury nor this Court is justified in ignoring the unimpeached, uncontradicted testimony of a physician in respect to scientific information of which a layman would not be expected to have any reliable knowledge. Prudential Ins. Co. v. Davis, 18 Tenn.App. 413, 78 S.W.2d 358 (1934). 32 C.J.S. Evidence sec. 569 (4), p. 627.

This Court always acts with reluctance in superseding a verdict of a jury approved by the trial judge, especially in view of the countless decisions declaring the narrow limitation of such action. Many decisions on the subject of the effect of prior illness upon accident insurance are annotated in 131 A.L.R. 235, 144 A.L.R. 1402, 82 A.L.R.2d 605 and supplements thereto. These have been studied with great interest and care with the conclusion that the present case falls within that group of cases in which the testimony in the record will not sustain the verdict for the plaintiff.

The verdict and judgment in favor of the plaintiff is reversed and the suit is dismissed at the cost of the appellee-plaintiff.

Reversed and dismissed.

Shriver, P. J. (M.S.), and Puryear, J., concur.